IN THE SUPREME COURT OF NORTH CAROLINA

No. 220A19

Filed 28 February 2020

IN THE MATTER OF: J.M, J.M., J.M., J.M., J.M.

Appeal pursuant to N.C.G.S. § 7B-1001(a1)(1) from an order entered on 27 February 2019 by Judge Tiffany M. Whitfield in District Court, Cumberland County. This matter was calendared for argument in the Supreme Court on 5 February 2020 but determined on the record and briefs without oral argument pursuant to Rule 30(f) of the North Carolina Rules of Appellate Procedure.

> *Michael A. Simmons for petitioner-appellee Cumberland County Department of Social Services.*
>
> *Parker Poe Adams & Bernstein LLP, by Andrew F. Lopez, for respondent-appellee guardian ad litem.*
>
> *Sean P. Vitrano for respondent-appellant mother.*

EARLS, Justice.

Respondent-mother appeals from the trial court's order terminating her parental rights to her minor children J.M. (Edward), J.M. (David), J.M. (Carol), J.M. (Barbara), and J.M. (Alan).[1] We affirm.

---

[1] The minor children will be referred to throughout this opinion as "Edward," "David," "Carol," "Barbara," and "Alan," which are pseudonyms used to protect the children's identities and for ease of reading. *See* N.C.R. App. P. 42(b)(1).

On 8 January 2016, the Cumberland County Department of Social Services (DSS) filed a petition alleging Edward, David, Carol, Barbara, and Alan were neglected, seriously neglected, and dependent juveniles pursuant to N.C.G.S. § 7B-101(9), (15) and (19a), because they did not receive proper care, supervision, or discipline from their parents; had not received necessary medical care; lived in an environment injurious to their welfare; and their parents' conduct evinced a disregard of consequences of such magnitude that it constituted an unequivocal danger to their health, welfare, or safety. DSS had received multiple child protective services reports that year regarding the family and had conducted a family assessment, which led to the provision of services to the family beginning on 7 October 2015. In part, DSS alleged adequate food for the family was seldom in the home; respondent-mother was about to be evicted; and the condition of the home was poor in that it was heavily infested with roaches, the carpets were heavily soiled, and spoiled food was routinely left around the home. The children were alleged to have not been provided necessary wellness check-ups, physicals, immunizations, and other medical care. Police officers had also been called to the home on several occasions due to domestic disturbances, and respondent-mother had tested positive for marijuana on 2 October 2015. DSS also obtained non-secure custody of the children.

After a hearing on 9 June 2016, the trial court entered an adjudication and temporary disposition order on 1 July 2016. Respondent-mother stipulated to facts establishing the children did not receive proper care and supervision from their

parents and lived in an environment injurious to their welfare due to unsanitary living conditions and their parents' failure to ensure they received necessary medical and "educational/remedial care." DSS dismissed the allegations of serious neglect and dependency. Based upon the stipulations, the court adjudicated the children to be neglected juveniles. The court continued the matter for disposition and left the children in DSS custody.

The trial court conducted a dispositional hearing on 14 July 2016 and entered its order from that hearing on 1 December 2016. The court continued custody of the children with DSS and directed DSS to continue to make reasonable efforts to reunite the children with their parents. Respondent-mother was ordered to complete a psychological evaluation and follow all recommendations, engage in mental health treatment, complete a substance abuse assessment and follow all recommendations, submit to random drug screens, complete an "Impact of Domestic Violence on Children" class, obtain and maintain stable housing and employment, complete a parenting assessment and follow all recommendations, and complete age-appropriate parenting classes. Respondent-mother was also granted weekly supervised visitation with the children.

On 12 April 2017, the trial court entered its initial permanency planning order. The court found respondent-mother was making some progress toward reunification with the children but had made little progress toward addressing the issues that led to the removal of the children from her home. The court further found respondent-

mother's visits with the children were chaotic; she was in need of more intensive parenting classes; she had attended only 3 of 17 scheduled mental health treatment sessions; she resided in a three-bedroom apartment but was in the process of being evicted due to a domestic violence incident with the children's father; she was unemployed and had no transportation; and although she was generally cooperative with DSS, she refused to submit to random drug screens. The court set the primary permanent plan for the children as reunification with respondent-mother with a secondary plan of custody with a suitable person. Respondent-mother was ordered to comply with her case plan as set forth in the initial disposition order and directed to sign a release of information from her mental health provider.

The trial court conducted a subsequent permanency planning hearing on 18 May 2017. In its order from that hearing, the court found respondent-mother was incarcerated with a pending charge of felony assault with a deadly weapon with intent to kill or seriously injure. The alleged victim of the assault was the children's paternal uncle. The court found respondent-mother had failed to fully engage in the services outlined in her case plan and had not demonstrated a desire to make the necessary changes to correct the conditions that led to the removal of the children from her care. The court ceased all visitation with the children and ordered there be no contact between the children and their parents. The primary permanent plan for the children was changed to adoption, while the secondary plan remained unchanged

as custody with a suitable person, and DSS was ordered to pursue the termination of parental rights to the children.

DSS did not immediately pursue termination of parental rights, and the trial court conducted two additional permanency planning hearings on 2 October 2017, and 5 March 2018. In its order from the March 2018 hearing, the court found that although respondent-mother was not progressing on her case plan, she had identified a possible kinship placement for the children that required DSS to conduct a home study. The court continued the primary and secondary permanent plans for the children as adoption and custody but directed DSS to not pursue termination of parental rights. The home study was subsequently completed, and the placement was not approved.

On 10 July 2018, DSS filed a petition to terminate parental rights to the children. DSS alleged grounds existed to terminate respondent-mother's parental rights on the bases of neglect, willfully leaving the children in DSS custody for more than 12 months without making reasonable progress toward correcting the conditions that led to the children's removal from her care, willfully failing to pay a reasonable portion of the cost of the children's care while they were in DSS custody, dependency, and abandonment. *See* N.C.G.S. § 7B-1111(a)(1)–(3), (6)–(7) (2017). The trial court conducted a hearing on the petition on 15 and 16 November 2018 and entered an order terminating respondent-mother's parental rights on 27 February 2019. The court concluded grounds existed to terminate respondent-mother's parental rights

based on neglect, failure to make reasonable progress toward correcting the conditions that led to the children's removal from her care, failure to pay a reasonable portion of the cost of the children's care while they were in DSS custody, and dependency. The court further concluded terminating respondent-mother's parental rights was in the best interests of the children. Respondent-mother appeals.

On appeal, respondent-mother argues the trial court erred in adjudicating the existence of the grounds to terminate her parental rights. More specifically, she contends that the trial court's findings of fact do not have any bearing on the likelihood that the neglect the children experienced before they were removed from her custody will be repeated, that she made reasonable progress towards correcting the conditions that led to the children's removal, that there was no evidence concerning her ability to pay the costs of her children's support during the relevant time period, and finally, that the record did not support the trial court's conclusion that at the time of the termination hearing the children were dependent juveniles. However, the trial court's extensive findings of fact in this case as to each of the grounds for removal are supported by clear and convincing evidence, and therefore are deemed conclusive. *See In re N.G.*, 186 N.C. App. 1, 4, 650 S.E.2d 45, 47 (2007). With regard to each ground, the trial court's findings of fact taken as a whole do support the legal conclusions that the neglect of the children is likely to be repeated, that respondent-mother failed to remedy the conditions, including inadequate housing, mental health and substance abuse issues, lack of parenting skills and

issues with domestic violence, that led to her children being removed from her custody, and that respondent-mother did not have the ability to provide care or supervision to the juveniles such that they were indeed dependent.

Because only one ground is needed to terminate parental rights, we only address in detail below respondent-mother's arguments as to the ground of failure to pay a reasonable portion of the cost of the children's care while they were in DSS custody. *See In re E.H.P.*, 372 N.C. 388, 395, 831 S.E.2d 49, 53 (2019). However, we do not thereby imply that the evidence and supported findings were not also sufficient to establish the other three grounds for termination found by the trial court in this case. The record is clear that at the time of the termination hearing, respondent-mother had failed to maintain stable and adequate housing for the juveniles and had failed to substantially comply with the services outlined for her to complete. She had only attended three of seventeen sessions for mental health treatment that had been scheduled for her. She continued to have issues with domestic violence and had not remained employed on any consistent basis. Her inability to address these issues was a clear indication that there was a strong likelihood of neglect in the future, that there had not been reasonable progress towards correcting the conditions leading to the removal of the children, and that the children were dependent.

"We review a trial court's adjudication under N.C.G.S. § 7B-1111 'to determine whether the findings are supported by clear, cogent and convincing evidence and the findings support the conclusions of law.' " *Id.* at 392, 831 S.E.2d at 52 (quoting *In re*

*Montgomery*, 311 N.C. 101, 111, 316 S.E.2d 246, 253 (1984)). When DSS filed its petition, a court could terminate parental rights where:

> The juvenile has been placed in the custody of a county department of social services . . . and the parent, for a continuous period of six months next preceding the filing of the petition or motion, has willfully failed for such period to pay a reasonable portion of the cost of care for the juvenile although physically and financially able to do so.

N.C.G.S. § 7B-1111(a)(3) (2017). The "cost of care refers to the amount it costs the Department of Social Services to care for the child, namely, foster care." *In re Montgomery*, 311 N.C. 101, 113, 316 S.E.2d 246, 254 (1984) (quotation marks omitted). "A parent is required to pay that portion of the cost of foster care for the child that is fair, just and equitable based upon the parent's ability or means to pay." *In re Clark*, 303 N.C. 592, 604, 281 S.E.2d 47, 55 (1981).

In support of this ground, the trial court found the children had been in DSS custody since 8 January 2016, including the entire relevant six-months under the statute, which was from 10 January 2018 until 10 July 2018. During this time, the cost of care for each of the children was in excess of $40,000.00. The court further found:

> 116. That during the six-month period immediately preceding the filing of the Petition herein, the Respondents paid an amount of zero toward the reasonable cost of care.
>
> 117. The Court finds that the Respondents each had the ability to pay an amount greater than zero toward the cost of care and the basis for that finding is as follows:

a. Both of the Respondents are capable of working.

b. There is no evidence that either of the Respondents were unable to work or became disabled during the six-month period immediately preceding the filing of the Petition. In fact, the Respondent Mother through her sworn testimony, reported that she had been employed at Hair Joy between January 2018 and June 2018; however, she did not pay anything towards the reasonable cost of care for the juveniles.

c. That an order was rendered in Cumberland County file number 16 CVD 3061 on November 17, 2016, directing the Respondent Mother to pay $50.00 per month as child support for the juveniles beginning December 1, 2016. As part of that order, the Court found that the Respondent Mother, was physically and financially able to pay a reasonable portion of the cost of care for the juveniles as evidenced by the *Order of Paternity and Permanent Child Support* filed in Cumberland County File 16 CVD 3061 . . . . That since the entry of that, the Respondent Mother has not paid any money towards that order as evidenced by the *Order/Payment History* . . . .

. . . .

118. That given the Respondents' ability to work and earn money and their failure to pay any amount toward the reasonable cost of care, the Court finds that the Respondents' failure to pay was willful.

Respondent-mother does not challenge the trial court's finding that she paid nothing toward the cost of care for her children during the relevant six-month period, and that finding is binding on appeal. *In re T.N.H.*, 372 N.C. 403, 407, 831 S.E.2d 54, 58 (2019) (citing *Koufman v. Koufman*, 330 N.C. 93, 97, 408 S.E.2d 729, 731 (1991)).

Respondent-mother argues the trial court's finding that she worked at Hair Joy between January 2018 and June 2018 is unsupported by the evidence. We agree and disregard this finding. The evidence established respondent-mother began working at Hair Joy during the latter part of 2016 and remained employed there for nine or ten months. In November 2017, she began working at a Popeyes restaurant but quit that job by January 2018, because a young co-worker would "always come at [her] like sideways and stuff . . . ." Respondent-mother had not been employed since quitting work at Popeyes, and she had just started looking for work at the time of the termination hearing.

Respondent-mother also argues the record does not support the trial court's finding she could work during the relevant six-month period. She contends she had not seen the person responsible for managing her medication during the three to four months prior to July 2018 due to his military deployment, and she thus had not received her medications for anxiety and depression, which led to an increase in her depression symptoms and a two-day hospitalization at Cape Fear Valley Hospital. However, this argument is unavailing because respondent-mother was working at the beginning of the relevant six-month period and there is nothing in the record to indicate that she could not have found an alternative health-care provider to manage her medication.

In 2016, the Cumberland County Child Support Department received referrals for each of the children when they came into DSS custody. The department filed a

complaint for child support from respondent-mother, which was heard on 17 November 2016. Pursuant to a court order entered in December of 2016, respondent-mother was to pay child support in the amount of $50 per month for all five children. Respondent-mother never moved to modify or set aside the order, and she was thus subject to a valid court order during the relevant six-month period that established her ability to financially support for her children. *See In re S.T.B.*, 235 N.C. App. 290, 296, 761 S.E.2d 734, 738 (2014) (" '[A] proper decree for child support will be based on the supporting parent's ability to pay as well as the child's needs, there is no requirement that petitioner independently prove or that the termination order find as fact respondent's ability to pay support during the relevant statutory time period.' " (quoting *In re Roberson*, 97 N.C. App. 277, 281, 387 S.E.2d 668, 670 (1990))).

Moreover, as discussed above, the evidence establishes respondent-mother was working at a Popeyes restaurant at the beginning of the six-month period but quit the job of her own accord. The record also establishes that any fault for the lapse in respondent-mother's medication lies with her, as she chose to not seek another provider until her symptoms worsened to the point that she needed to be hospitalized. Respondent-mother cannot assert a lack of ability to pay for her children's support, when that lack was due to her own conduct. *See In re Tate*, 67 N.C. App. 89, 96, 312 S.E.2d 535, 540 (1984) ("[W]hen a parent has forfeited the opportunity to provide some portion of the cost of the child's care by her misconduct, she 'will not be heard to assert that . . . she has no ability or means to contribute to the child's care and is

therefore excused from contributing any amount.' " (quoting *In re Bradley*, 57 N.C. App. 475, 479, 291 S.E.2d 800, 802–03 (1982))).

Here, the trial court's findings establish respondent-mother had the ability to pay some amount toward the cost of care for her children while they were in DSS custody but paid nothing. These findings support its conclusion that grounds exist to terminate respondent-mother's parental rights to the children pursuant to N.C.G.S. § 7B-1111(a)(3). Respondent-mother does not challenge the trial court's conclusion that termination of her parental rights to the children is in their best interests, and we affirm the court's order.

AFFIRMED.